COURT OF APPEALS OF VIRGINIA


Present: Judges Frank, Humphreys and McClanahan
Argued at Chesapeake, Virginia


C. S.
                                              OPINION BY
v.   Record No. 3156-02-1       JUDGE ELIZABETH A. McCLANAHAN
                                          SEPTEMBER 30, 2003
VIRGINIA BEACH DEPARTMENT OF
 SOCIAL SERVICES


         FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                     Edward W. Hanson, Jr., Judge


              Deborah Vatidis Bryan (Kaufman & Canoles,
              P.C., on brief), for appellant.

              Lee E. Devendorf, Assistant City Attorney
              (Leslie L. Lilley, City Attorney; Nianza E.
              Wallace II, Assistant City Attorney; Office
              of the City Attorney, on brief), for appellee.


     C.S. (mother) appeals a decision of the Circuit Court of

the City of Virginia Beach terminating her parental rights to

her child, B.B., and awarding custody of the child to the

Virginia Beach Department of Social Services.  On appeal, mother

contends that the trial court erred in ruling (1) that there was

clear and convincing evidence satisfying the statutory factors

required by Code § 16.1-283(C)(2) for termination of appellant's

residual parental rights as to B.B.; (2) that there was clear

and convincing evidence that termination of appellant's residual

parental rights was in the child's best interests; and (3) that

appellant's constitutional right to privacy to raise her child

as she sees fit, within the constraints of the law, was violated.[1]  For the reasons that follow, we reverse, vacate and remand.

## I.  Background

On October 11, 2000, the Child Protective Services division of the Virginia Beach Department of Social Services (DSS) received a referral regarding young children found alone at a store at an early hour of the morning.  A DSS investigator located mother at her job and accompanied her back to her home where four minor children, E. (born June 16, 1989), C. (born March 9, 1990), I. (born January 28, 1993), and B.B. (born January 13, 1999), were found alone without supervision. Evidence at hearing included testimony that an older teenage child of mother was left to babysit the children, but that the teenage child had left them unsupervised, unbeknownst to the mother.  The children appeared healthy and well fed.  The investigator developed a safety plan with mother to remedy any future supervision problems, and left the home.

Very early on October 12th, mother called her supervisor at work to explain what had happened the previous day and to inform her employer that she could not return to work due to problems with the children.  Later that day, the DSS investigator visited

---

[1] Because the application of Code § 16.1-283(C)(2) to appellant's first question presented decides the case, we do not address appellant's remaining questions.

the home and not finding mother and children there, became concerned that mother had "absconded" with the children. Mother was not under any court order or duty to remain at the home. The DSS investigator immediately filed a petition for an emergency removal order in the juvenile and domestic relations district (J&DR) court. The court entered the emergency removal order on October 19, 2000, finding "severe neglect" and that mother had "absconded" with the children. In the same order, the court appointed a guardian ad litem to represent the children.[2]

In the meantime, mother took the older children to the health department, first to be immunized, and again for physicals, so that she could enroll the children in public school. She enrolled two of the children in school on October 31, 2000. B.B., who was still nursing, had not yet reached

---

[2] The guardian ad litem failed to file a brief or appear at hearing in violation of Rules 1:5 and 5A:19 of the Rules of the Virginia Supreme Court. However, at the trial de novo in the trial court, the guardian ad litem recommended to the chancellor that the children be returned to mother. He stated, "I am completely against Social Services at this point as to what's happened, the end result of this case." "In my opinion, they were totally disingenuous from day one." He also stated, "Your Honor, I look at the statute, 283C, 16.1 283C [sic], [m]other has been substantially able to remedy the conditions which caused the children to be put in foster care initially, or caused them to be removed notwithstanding the efforts of social services." He continued, "I guess the net result, Judge, is it's like amputating a finger to get out a splinter. Social Services, in my opinion, has gone way overboard." He concluded, "In my opinion, [DSS] will never give these kids back to her." "Virginia Beach Social Services will never, ever agree this woman is cooperating in any fashion."

- 3 -

school age, and mother was in the process of investigating where to enroll E., the oldest of the four children.

On November 1, 2000, the DSS investigator found mother with the children at the home of mother's sister in Hampton. The investigator, with the order of the J&DR court, entered the home with two uniformed police, seized the children, and detained mother. Initially, the children were placed in the same foster home together. Shortly thereafter, due to disruption in the foster home, the foster parents asked that the three older children be placed elsewhere.[3] On December 20, 2000, the J&DR court entered an order maintaining custody of the children in DSS foster care, and set a hearing date for January 2001.

Concurrent with the hearing, on January 16, 2001, DSS filed a foster care service plan, as required by Code § 63.2-906. The plan detailed that the children were placed into foster care based on the lack of supervision incident, mother's alleged "absconding" with the children, and the children's lack of schooling. The goal of the plan was to return the children to the parent. The requirements that mother had to meet in order for the children to be returned were: (1) obtain psychological evaluation and follow the recommendations of the therapist for

_____

[3] Subsequently, between the children, over a twenty-four-month period there were eighteen different placements: E. was placed in nine or ten different foster homes, C. in two, and I. in five or six. B.B. remained in the same home throughout.

- 4 -

individual therapy; (2) obtain suitable employment in an effort to provide financial stability in caring for the children and herself; (3) provide adequate furnishings for the children, i.e. beds or mats for sleeping; (4) become involved in family therapy through the Comprehensive Mental Health Program; (5) provide adequate supervision for her children at all times and provide names of available backup babysitters; and (6) maintain children's enrollment in an educational program certified by the state, or provide DSS with proof of certification to home school the children.  According to the record, DSS was mostly concerned with mother's "secretive lifestyle" and her distrust of government.  The trial judge reiterated this in his ruling at hearing:

> I think we all know the real reason for the problem, and the problems – the problems in the case, the real core reason is Ms. [S.]'s fundamental belief is [sic] that she cannot – the government cannot be trusted.  The authorities cannot be trusted, and that she alone is the person who decides what's best for her children.  Because of that belief, they have basically lived in this secretive environment in this city of 435,000 people for about two years.  And if it hadn't been for that episode at Kmart, I suspect that nothing would have changed.

On February 20, 2001, mother underwent psychological evaluation by Robert Seltzer, Ph.D., who found that mother was "hypersensitive to being controlled," that she saw "the world much differently than most," and that she was "at risk for decompensating into very disturbed behavior."  He stated that

- 5 -

medications "could be useful" if mother decompensated "into an agitated, impulsive, manic or paranoid state."

Subsequently, mother was referred to Dr. F. Jeffery Schlichter for further independent psychological evaluation. After several assessments, in a letter to the Virginia Beach City Attorney representing DSS, Dr. Schlichter opined that

> it would be appropriate and reasonable, now that Ms. [S.] is caught up in the web of VBDSS and the Virginia Beach Juvenile and Domestic Relations District Court, for the social services and legal system to return her children to her care and help her develop a more socially acceptable way of parenting and managing them.

Dr. Schlichter also found that mother had not decompensated, as Dr. Seltzer had predicted, and such speculation that mother was at risk for decompensation and disturbed behavior proved to be inaccurate. He observed that mother, "despite the incredible frustration she has been experiencing daily from the loss of contact and control of her children" had "become better integrated and more functional." He concluded that he could not "imagine how keeping [mother's] children away from her is helpful to them or her." He referred mother to Ms. Linda Schlichter, a psychotherapist, who diagnosed mother with post-traumatic stress disorder, depression and grief resulting from the removal of her children. Mother continued in therapy with Ms. Schlichter for the duration of this matter.

In April 2001, six months after being removed from his mother, B.B. was examined by a clinical psychologist who found the child passive and developmentally delayed as to intellectual functioning and speech. The child was re-evaluated six months later, approximately a year after being placed in foster care, and was found to have "caught up" and to have bonded with the foster mother. The psychologist did not have enough information to opine on the cause of the child's earlier developmental problems.

The J&DR court reviewed the case and foster care plan in July 2001. The goal of the plan remained to return the children to the parent. However, signs of frustration with mother appeared in DSS's report to the court. DSS reported "lack of cooperation" and "limited progress" with the initial foster care plan factors. The report also detailed that mother's visitation with the children had been suspended by DSS due to her "disruptive" behavior, including negative comments on the care the children were receiving, and complaints or concerns that the children were being physically or sexually abused.[4]

For the next year, mother and children remained "in the web" of DSS, the J&DR court, the circuit court, psychologists

---

[4] Evidence in the circuit court hearing included testimony that mother greatly distrusted the foster care system, having been placed in foster care as a child. She and others testified that mother suffered from physical and sexual abuse while in the system.

- 7 -

and foster homes.  As DSS became more and more suspicious of mother, visitation between mother and the children was granted, withdrawn, restored, and withdrawn again; custody of one of the children was restored, and withdrawn; and the foster care plan and attendant goal were reviewed and revised several times.  The requirements that mother needed to comply with in order to regain custody of her children were continually changed and increased by DSS in each successive foster care plan, despite mother's progress toward satisfying the goals of the initial foster case plan.

During the same time period, mother suffered severe depression due to the removal of her children by DSS.  In spite of that, she managed to apply for jobs, hold a job for a period of time, get married, get accepted to college, and obtain approval to receive college financial aid.  She remained in her sister's home, engaging in the education and nurturing of her niece.  Her sister agreed to provide financial support while mother provided cleaning, cooking and other household services.

On April 29, 2002, DSS filed a petition for a permanency planning hearing with a goal of termination of parental rights. A trial on the issue of termination of parental rights was held in the J&DR court on July 29, 2002.  At the conclusion of the evidence, the J&DR judge terminated mother's residual parental rights to all four children.

On appeal to the circuit court, a trial de novo was held from October 28 to October 31, 2002.  At its conclusion, the chancellor reversed the termination of parental rights with respect to E., C. and I., and returned them to mother.  By order, on November 4, 2002, the chancellor, finding that "the bond developed between [B.B.] and his siblings and [B.B.] and his Mother are not sufficiently formed," custody of B.B. was awarded to DSS, with instructions to make permanent placement and adoption arrangements, and mother's residual parental rights in the baby were terminated.

## II.  Analysis

The termination of parental rights is a grave, drastic, and irreversible action.  When a court orders termination of parental rights, the ties between the parent and child are severed forever, and the parent becomes "'a legal stranger to the child.'"  Lowe v. Dept. of Public Welfare, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986) (quoting Shank v. Dept. of Social Services, 217 Va. 506, 509, 230 S.E.2d 454, 457 (1976)).

> Our prior decisions clearly indicate a respect for the natural bond between children and their natural parents.  The preservation of the family, and in particular the parent-child relationship, is an important goal for not only the parents but also government itself.  While it may be occasionally necessary to sever the legal relationship between parent and child, those circumstances are rare.  Statutes terminating the legal relationship between parent and child should be interpreted consistently with the governmental objective

- 9 -

of preserving, when possible, the parent-child relationship.

Weaver v. Roanoke Dept. of Human Res., 220 Va. 921, 926, 265 S.E.2d 692, 695 (1980).

Code § 16.1-283 embodies "the statutory scheme for the . . . termination of residual parental rights in this Commonwealth [which] . . . 'provides detailed procedures designed to protect the rights of the parents and their child,' balancing their interests while seeking to preserve the family." Lecky v. Reed, 20 Va. App. 306, 311, 456 S.E.2d 538, 540 (1995) (quoting Rader v. Montgomery County Dept. of Social Services, 5 Va. App. 523, 526, 365 S.E.2d 234, 234-36 (1988), and Kaywood v. Halifax Dept. of Social Services, 10 Va. App. 535, 539, 394, S.E.2d 492, 494 (1990)). Section (C)(2) provides in pertinent part:

> The residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment, an entrustment agreement entered into by the parent or parents or other voluntary relinquishment by the parent or parents may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
>    *     *     *     *     *     *     *
>
> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the

- 10 -

reasonable and appropriate efforts of
social, medical, mental health or other
rehabilitative agencies to such end.

Code § 16.1-283. Therefore, before residual parental rights can be terminated under Code § 16.1-283(C)(2), a court must find: (1) by clear and convincing evidence; (2) that termination is in the child's best interests; and, (3) that the parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

We have defined clear and convincing
evidence as "that measure or degree of proof
which will produce in the mind of the trier
of facts a firm belief or conviction as to
the allegations sought to be established.
It is intermediate, being more than a mere
preponderance, but not to the extent of such
certainty as is required beyond a reasonable
doubt as in criminal cases. It does not
mean clear and unequivocal."

Gifford v. Dennis, 230 Va. 193, 198 n.1, 335 S.E.2d 371, 373 n.1 (1985) (quoting Salyer v. Salyer, 216 Va. 521, 525 n.4, 219 S.E.2d 889, 893 n.4 (1995), and Walker Agency & Aetna Cas. Co. v. Lucas, 215 Va. 535, 540-41, 211 S.E.2d 88, 92 (1975)).

DSS was required to present clear and convincing evidence sufficient to satisfy the requirements of Code § 16.1-283. The

circuit court found that DSS met that standard. "A trial court, 'by definition abuses its discretion when it makes an error of law.'" Shooltz v. Shooltz, 27 Va. App. 264, 271, 498 S.E.2d 437, 441 (1998) (quoting Koon v. United States, 518 U.S. 81, 100 (1996)). An abuse exists if the trial court makes factual findings that are plainly wrong or without evidence to support them. Code § 8.01-680; Goldhamer v. Cohen, 31 Va. App. 728, 734-35, 525 S.E.2d 599, 602 (2000) (citing Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990)). After considering the record as a whole, we find that the evidence falls short of the standard of clear and convincing proof that mother did not remedy substantially the conditions which led to the child's foster care placement. In fact, we find nothing in the record that supports the court's conclusions. "Conclusions unsupported by facts are insufficient to sever for all time the legal connection between parent and child." Ward v. Faw, 219 Va. 1120, 1125, 253 S.E.2d 658, 662 (1979).

There is no evidence that this mother physically or sexually abused her children, abused alcohol or drugs, or neglected the children as to feeding, clothing and maintaining their health. Additionally, when initially contacted, and before intervention by DSS, mother had her own apartment, a job, and was not on public assistance. Before intervention by DSS, neither she nor any of the children were on antidepressants. The behavior of DSS in this case was described at hearing by

mother's therapist as "adversarial and judgmental and almost to the point of intimidating."  The guardian ad litem argued that the motives of DSS were "disingenuous."  The trial judge transferred the matters to Hampton because he found, with regard to DSS that "the well's poisoned in Virginia Beach."

Here, the problems giving rise to the original foster care placement were resolved.  Before it could terminate mother's residual parental rights, the trial court was required to find that mother failed, "without good cause, . . . to follow through with appropriate, available and reasonable rehabilitative efforts" proposed by the Department of Social Services as outlined in its initial Foster Care Service Plan.  The initial Foster Care Service Plan listed six needs that mother had to meet to achieve the goal for the children, which was "return home."

First, mother was to attend and participate in psychological evaluation and individual therapy.  The evidence showed that she underwent an initial psychological evaluation on February 10, 2001, with Dr. Seltzer, had further independent evaluation in May and June 2001, with Dr. K. Jeffery Schlichter and entered into continuing therapy with Ms. Linda Schlichter beginning in June 2001.[5]

_____

[5] At hearing, mother's psychotherapist testified that mother overcame depression without medication and that when mother had been given medication (Prozac), it was "very unsuccessful and probably set her back."  In spite of that testimony, and

Second, mother was to obtain suitable employment in an effort to provide financial stability in caring for the children and herself.[6] The evidence showed that mother had successfully held a retail position for a year and was being considered for a promotion at that place of employment before DSS intervened. In fact, mother was also in training at a second, part-time job to supplement her income. After the incident with the children, mother felt it necessary to leave her employment and stay home with her children. The evidence showed that after the children were removed, mother fell into a deep depression, such that she was unable to work. She did, however, go back to work for her

_____

evidence that mother had an allergic reaction to the medication, at the end of the hearing, the trial judge said to mother, "if that doctor prescribes medication and you don't take it, I'll take these children, and I will put them up for adoption. Do you understand me?" Subsequently, the trial court order directed mother to take medication if recommended by her therapist. The United States Supreme Court in Sell v. United States, 123 S. Ct. 2174, 2183 (2003) (quoting Riggins v. Nevada, 504 U.S. 127, 134, 135 (1992)), stated that "an individual has a significant constitutionally protected liberty 'interest in avoiding the unwanted administration of antipsychotic drugs' -- an interest that only an 'essential' or 'overriding' state interest might overcome." Whether medication is appropriate is between a therapist and her patient. A decision by a patient to avoid taking unwanted medicine is not alone a basis for removal of children or terminating parental rights. See Code § 16.1-283; Rader, 5 Va. App. 523, 365 S.E.2d 234 (due process requires strict compliance with the statutory scheme for disposition of child custody cases); Wright v. Alexandria Div. of Soc. Serv., 16 Va. App. 821, 433 S.E.2d 500 (1993) (explaining that due process requires that allegations of parental unfitness be supported by at least clear and convincing evidence).

[6] Mother had an excellent work history prior to entanglement with DSS.

- 14 -

previous employer for a short time, apply for jobs, go on interviews, and find some employment in September and October 2001, after which she continued to look for appropriate employment. In an effort to provide stability and financial support for herself and her family, she moved in with her sister. While her sister worked and provided financial support, mother provided the family with household support. Mother has since married, and her new husband provides yet more financial resources and healthcare benefits to the family.

Third, mother was to provide adequate furnishings for the children, i.e., beds or mats for sleeping. According to the evidence, there was a bed in the home, and the home was spotlessly clean. Mother testified that she provided several, piled-up, thick quilts for the children to sleep on. The social worker's testimony indicated that having a bed was not a requirement and that a child would not be removed from a home for not having a bed.

Fourth, DSS required family therapy through the Comprehensive Mental Health Program. Mother could not comply with this requirement through no fault of her own. Code § 16.1-283(C)(2) requires DSS to make "reasonable and appropriate efforts" to help mother remedy the conditions that led to the children's foster care placement. At least twelve therapists, psychologists, and social workers employed by, or contracted by, DSS were involved in providing services to the

- 15 -

children.  However, over two years, DSS did not coordinate or make any reasonable or appropriate efforts to arrange family therapy between the children's therapists and the mother's therapist, or set up a family therapy session.  In fact, mother testified at trial that she was instructed by the DSS social worker assigned to the case not to tell B.B. that she was his mother.  When talking to B.B., the social worker referred to mother as "the Nice Lady."  There was evidence that the children's therapists were contracted by DSS to provide individual therapy only, and not family therapy.  Mother's therapist testified that she attempted to speak with most of the children's therapists early in the process, but that she did not have continuing contact with them because, "each of them made it clear to me that my input really wasn't being very highly regarded or taken into consideration."  Mother's therapist also testified that she had very little communication with DSS other than providing progress reports to them.  She also stated that she had written letters to DSS, to which she did not receive a response.  There was no evidence that DSS provided or referred mother to a family therapist.

Sixth, mother was to maintain the children's enrollment in an educational program certified by the state, or to provide DSS with proof of certification to home school the children.  This

requirement did not apply to the child at issue in this appeal because of his age.[7]

Therefore, the evidence clearly shows that mother substantially remedied, within twelve months, the conditions that led to B.B.'s foster care placement. She complied or made substantial efforts towards remedying each of the conditions except those conditions over which she had no control. Because mother met the requirements of the January 16, 2001 Foster Care Service Plan, she achieved the program goal, which was to return the children to her home. Code § 16.1-283(C) speaks in the conjunctive. Therefore, subsection (C)(2) precludes termination of parental rights when the parent has substantially remedied the conditions that led to the child's foster care placement.

### III. Conclusion

Finding that the evidence did not meet the clear and convincing standard as required by Code § 16.1-283(C)(2), the decision of the trial court is reversed as to termination of residual parental rights with regard to B.B., vacated with respect to all other matters incident to termination of parental rights in B.B., and remanded to the circuit court for

---

[7] Mother did, however, make efforts to immunize, get physical check-ups and enroll the other children in school even before the children were removed from her custody. When E. was restored to her custody, mother took a keen interest in the child's school assignments.

proceedings consistent with this opinion, including a determination on whether B.B. should remain in foster care.

<u>Reversed, vacated and remanded.</u>