COURT OF APPEALS OF VIRGINIA

Present:    Judges Elder, Felton and Senior Judge Willis

BARBARA MARIE ABT-BARNETT

                                                    MEMORANDUM OPINION[*]
v.       Record No. 2949-03-2                            PER CURIAM
                                                      APRIL 27, 2004
CHESTERFIELD-COLONIAL HEIGHTS
 DEPARTMENT OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Michael C. Allen, Judge

(Todd M. Ritter; Daniels & Morgan, on brief, for appellant).

(Michael S. J. Chernau; Chesterfield County Attorney's Office,
on brief, for appellee).

(No brief for the Guardian *ad litem* for the minor child).


Barbara Marie Abt-Barnett, mother, appeals a decision terminating her parental rights to her

daughter, S.A-B.  On appeal, mother contends the evidence was insufficient to support the

termination.   Upon reviewing the record and the briefs of the parties, we conclude that this appeal is

without merit.  Accordingly, we summarily affirm the decision of the trial court.  Rule 5A:27.

## Background

We view the evidence in the light most favorable to the prevailing party below and grant to

it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax County Dep't of

Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

Mother and her family have had a long history of involvement with the

Chesterfield-Colonial Heights Department of Social Services (the Department), dating back to

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

1988. On several occasions in 1988 through 1990, before S.A-B. was born, mother entrusted the custody of her three young sons to the Department because she was suffering from a nervous breakdown and had suicidal ideations. Mother has inconsistently sought treatment from numerous professionals for her mental health issues and she has been diagnosed as having a "severe borderline personality" and "chronic depression." In 1990, she retained custody of her three sons, but was hospitalized numerous times that year for psychiatric treatment. Her then eight-year-old son was suicidal. Also in 1990, her three-year-old son, C.A-B., was diagnosed with severe depression after he set fire to their home. He was adjudicated as emotionally abused, but he was returned to mother's care. In 1991, the family moved out of Virginia and the Department closed its case on the family.

Sometime before July 1999, the family returned to Virginia. At that time, S.A-B., who was born in January 1993, was with the family. In July 1999, C.A-B. admitted to forcibly sodomizing a five-year-old boy, and the court ordered that he undergo a sexual offender evaluation. In February 2000, a licensed clinical psychologist recommended that C.A-B. receive sex offender treatment and that he not be used in a caretaker role for S.A-B. However, mother ended C.A-B.'s treatment before it was completed and she often left S.A-B. in his care while she worked.

In September 2001, the police responded to the family's home because mother was threatening to commit suicide. The police found eight to ten cats in the house and saw no litter boxes. Detective Barton testified the house was dirty, had cat feces on the floor, and smelled of cat urine.

On October 2, 2001, the police again reported to the residence when S.A-B., who was eight years old, told a friend of hers that she was home alone and she feared someone was breaking into the home. The friend's parent contacted the police. Mother was at work, and S.A-B. told Detective Barton that her brother, C.A-B., who was fourteen years old, was supposed to be watching her, but

he had left the residence, and she did not know where he was. Barton testified that S.A-B. was frightened and that when S.A-B. spoke to mother on the telephone, Barton could hear mother yelling at S.A-B. for calling the police. Barton informed mother that S.A-B. had not called the police, but that her friend's parent had called the police out of concern for S.A-B. When mother learned this, she would not permit S.A-B. to stay at her friend's house until she got home from work. Barton described mother as agitated and annoyed. Mother did not express concern for S.A-B. While Barton was still at the residence, mother telephoned and spoke with S.A-B., who then began crying. S.A-B. told Barton that mother had threatened to "beat her within an inch of her life" when she got home. S.A-B. also told Barton that she had been hearing voices and seeing things for about two years, but mother had not taken her to a doctor concerning these conditions.

On that same evening, C.A-B. was arrested for attempting to steal a go-cart. At the time, he was supposed to be under house arrest for a prior larceny. Barton telephoned mother to tell her that they were taking C.A-B. to the juvenile detention center. Mother indicated she was "glad" to hear that he was going to the facility. Mother then became agitated and said she would not bring C.A-B.'s medication to the facility because she could not drive at night.

On October 19, 2001, Child Protective Services (CPS) filed petitions in the juvenile and domestic relations district court (JDR court), alleging that S.A-B. and C.A-B. were abused and neglected children. The JDR court awarded emergency custody of the children to the Department and ordered mother to undergo a psychological evaluation. In November 2001, the JDR court adjudicated S.A-B. as abused or neglected and ordered that she remain in foster care.

The first foster care service plan had the goal of placing S.A-B. in the custody of her maternal grandmother. Mother agreed with the plan and reviewed the terms of the plan with Kiva Best, a social worker for the Department. Best testified that mother was to work on her parenting

skills, develop an appropriate supervision plan for her daughter, and participate in family and individual counseling.

From December 2001 to the date of the trial in July 2003, mother was treated or evaluated by six different mental health professionals. Dr. James Correll, a licensed clinical psychologist, diagnosed mother with deeply engrained personality variables with aspects of a personality disorder and narcissistic traits. Dr. Correll stated that mother's condition would create a "particularly toxic environment for a child." He also expressed concern that mother's visits with S.A-B. caused the child to be emotional.

Mother's visitation rights with S.A-B. were temporarily suspended because mother made inappropriate comments during the visits. The record shows that mother once told both S.A-B. and C.A-B. that she was not their mother anymore and she was saying her "good-byes" because she had nothing to live for. She also told the children not to tell anyone their family business. During one visit, mother asked S.A-B., who was seated next to mother, to move away from her because she did not want to be near her. Mother also said it was S.A-B.'s fault she was in foster care. Best testified that, prior to the trial court hearing, mother still had not made enough progress in her therapy to resume visitation with S.A-B. Thus, at the time of the hearing, mother had not seen her daughter in more than one year. In addition, mother "cut off all communications" with Best, and Best communicated with mother only through her attorney.

The Department also referred mother to parenting and anger management classes. Mother attended six parenting sessions and appeared angry that she was there. The social worker did not recall that mother acknowledged she had any parenting deficiencies.

From March 2002 until June 2002, mother had four counseling sessions with Pat Brown, a licensed clinical social worker. The Department had referred mother to Brown in an attempt to restore her visitation rights with the children. Mother told Brown she did not want to be there and

that she had no mental health issues. Mother often responded to Brown's questions with "it's none of your business," and she called Brown stupid and incompetent. Brown referred mother to a psychiatrist for medication management, but mother declined the referral, stating again that she had no mental health issues. Brown also tried to give mother a list of anger management counselors, and mother refused to accept the list, throwing it onto the floor. Mother was also uncooperative about signing medical release forms, which would have allowed open communication between her therapists and S.A-B.'s therapist. At her last session with Brown, mother sat facing the wall and refused to talk with Brown.

Also, during this time period, S.A-B. reported that C.A-B. had sexually assaulted and sodomized her on numerous occasions during 2000 while mother left her solely in C.A-B.'s care. C.A-B. admitted to the offenses. However, mother refused to acknowledge that her daughter had been sexually abused, and she told Brown that the Department had "convinced" her daughter to make the allegations.

In June 2002, the Executive Director of the Chesterfield Community Services Board (the Board) wrote a letter to the JDR judge stating that, after six months of general psychotherapy and parenting skills therapy, the treatment team determined that mother would not benefit from further services based on her display of "serious problems" that were not amenable to therapy. Although mother had attended her scheduled sessions, she had consistently maintained she had no anger management or mental health issues. Furthermore, mother had been verbally abusive and had threatened some of the staff. She once stated she would like to return to the building with a shotgun. Therefore, the Board opined it would be "counterproductive and potentially dangerous" for mother to continue to receive their services.

Meanwhile, S.A-B. was receiving counseling from Joanne Seawell, a licensed clinical social worker. At the start of her therapy, mother told Seawell that S.A-B. did not need therapy and did

- 5 -

not have any problems. Seawell diagnosed S.A-B. with post-traumatic stress syndrome as a result of the sexual abuse and the "trauma that went on with" her mother. S.A-B. also told Seawell that C.A-B. abused her emotionally and that mother often left her alone with C.A-B. Seawell stated that when S.A-B. first came to therapy, she was "very afraid" of her mother, but this seemed to get better after visitation with mother was suspended. S.A-B. told Seawell that mother had physically abused her and that C.A-B. frightened her when she was in the bathroom to the point that she had stopped brushing her teeth. When S.A-B. first came into the custody of the Department, she had numerous cavities and required two root canals.

Seawell opined that S.A-B. needs someone at home who will be safe, stable and steady. Seawell testified S.A-B. needs to be "in a permanent situation where there [are] parental figures [who] are able to support her and encourage her." S.A-B.'s behavior has deteriorated in foster care and she faces long-term counseling. Seawell opined that S.A-B. would do well if she is adopted.

In October 2002, the Department filed a petition to terminate mother's parental rights for the purpose of adoption of S.A-B. Best testified that the Department sought adoption because there had been little progress in the case, mother had not admitted that she had mental health issues impacting her ability to parent, and mother had accepted no responsibility for S.A-B.'s situation.

Mother presented evidence that, at the time of the trial court hearing, she was seeing a psychiatrist for medication and support. She was also in therapy with a licensed professional counselor for anxiety and depression issues. Mother admitted that she previously left S.A-B. at home alone or solely in C.A-B.'s care. She denied that she physically abused S.A-B. Regarding the incident of sexual abuse involving her two children, mother stated she could not "accept" the charge without talking to her children about the incident. She acknowledged that C.A-B. had pled guilty to a sexual abuse charge. Mother testified that the children's father abandoned the family and she attributed any of her possible depression or mental health issues to post-partum depression and

depression related to the suicide of one of her children. Concerning her anger management issues, mother stated that she is angry at the Department because she cannot seem "to make them happy" and she did not know if anything could change that anger.

The guardian *ad litem* for S.A-B. opined that adoption was in the child's best interests. S.A-B. had been in foster care for almost three years, and she had indicated she wants a family.

The trial court found that it was in S.A-B.'s best interests to terminate mother's parental rights and that mother had been unwilling or unable to remedy the conditions leading to the child's placement in foster care. Mother appeals that decision.

Analysis

Code § 16.1-283(B) provides in pertinent part:

> The residual parental rights of a parent or parents of a child found by the court to be neglected or abused and placed in foster care as a result of (i) court commitment . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
> 1. The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development; and
>
> 2. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time. In making this determination, the court shall take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care.

Mother contends the evidence failed to establish that "mother's conditions" had not been corrected to allow S.A-B.'s safe return within a reasonable period of time.

The Department introduced extensive testimonial evidence demonstrating the severity of mother's mental illness. Several therapists opined that she suffers from depression and personality disorders. She has been hospitalized repeatedly for her mental health condition.

- 7 -

Mother refuses to acknowledge that her mental health issues have contributed to the foster care placement of S.A-B. and mother has not sought consistent and continuing treatment for her mental health issues. Indeed, Best testified that there had been little progress in the case despite the Department providing mother with numerous referrals to mental health professionals and parenting and anger management counselors since December 2001. The evidence showed that mother was less than cooperative with some of her counselors and she did not acknowledge any responsibility for the family's circumstances or that she has any parental deficiencies. In addition, based on mother's inappropriate behavior during supervised visitation with her daughter, mother's visitation rights with S.A-B. were temporarily suspended and had not been restored by the time of the trial court hearing due to mother's lack of progress. Mother has not seen S.A-B. in more than one year.

Moreover, mother apparently refuses to acknowledge that her son sexually abused S.A-B. despite the fact that her son has admitted the charge. In addition, mother often left her daughter in her son's care although he had previously committed a sexual offense against a five year old. Furthermore, S.A-B.'s counselor opined that S.A-B. suffers from post-traumatic stress syndrome attributable in part to "trauma" associated with mother's treatment of her. S.A-B. has expressed fear of her mother and was clearly physically and emotionally neglected and abandoned by mother. S.A-B. also indicated she was physically abused by mother, although mother denied this charge.

This case is distinguishable from C.S. v. Virginia Beach Dep't of Soc. Servs, 41 Va. App. 557, 586 S.E.2d 884 (2003). In C.S., there was no evidence that the mother physically abused or neglected the children. Id. at 566, 586 S.E.2d at 888. Here, the record shows both abuse and neglect of S.A-B. by mother. In addition, in C.S., there was no evidence that anyone in the family suffered from depression until the Department of Social Services became involved with

the family. Id. at 566-67, 586 S.E.2d at 588-89. Here, mother has a long history of mental health issues and S.A-B. suffers from post-traumatic stress syndrome as a result of her home life. One of mother's sons committed suicide. In C.S., the behavior of the Department of Social Services was "disingenuous" to the point that the trial judge transferred the case to another Department. Id. at 567, 586 S.E.2d at 889. Here, there was no allegation or proof that the Department acted in an adversarial manner in its dealings with mother. Indeed, the evidence showed that, to the contrary, mother did not cooperate with the efforts of the Department to assist her in remedying the conditions leading to the foster care placement.

S.A-B. has been in foster care for almost three years. Her counselor testified that S.A-B. has had some behavioral problems in foster care due to her need for stability and a permanent situation. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

"The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (citation omitted). The record supports the trial court's finding that the Department presented clear and convincing evidence satisfying the statutory requirements of Code § 16.1-283 and establishing that termination of mother's parental rights is in S.A-B.'s best interests.

Accordingly, we summarily affirm the decision of the trial court. See Rule 5A:27.

Affirmed.