COURT OF APPEALS OF VIRGINIA

Present:   Judges Haley, Petty and Powell
Argued at Salem, Virginia


CHRISTOPHER M. WEAVER

                                                        MEMORANDUM OPINION[*] BY
v.        Record No. 1000-08-3                       JUDGE CLEO E. POWELL
                                                             MARCH 17, 2009
WYTHE COUNTY DEPARTMENT OF
  SOCIAL SERVICES


FROM THE CIRCUIT COURT OF WYTHE COUNTY
Josiah T. Showalter, Jr., Judge

(R. Christopher Munique; Lacy, Campbell & Munique, P.C., on
brief), for appellant.  Appellant submitting on brief.

S. Vernon Priddy III; Marc Alan LeBlanc, Guardian *ad litem* for
the minor child (Michael R. Bedsaul; Sands, Anderson, Marks &
Miller, P.C., on brief), for appellee.


Christopher M. Weaver ("Weaver") appeals the decision of the trial court terminating his

parental rights to his daughter, N.W., pursuant to Code § 16.1-283(C).  Weaver contends that

there was insufficient evidence to support the trial court's finding that the Wythe County

Department of Social Services' ("DSS") actions were reasonable and appropriate and that he was

not making substantial progress in remedying the conditions that required continuation of N.W.'s

foster care placement.  Finding the evidence sufficient, we affirm.

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

"We view the evidence in the 'light most favorable' to the prevailing party in the circuit court and grant to that party the benefit of 'all reasonable inferences fairly deducible therefrom.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 262, 616 S.E.2d 765, 767 (2005) (quoting Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)).

Weaver and Brandon Nicole Weaver ("Brandon") are the biological parents of N.W., who was born in September of 2003. On October 7, 2004, Brandon brought N.W. to the hospital emergency room because N.W. had stopped breathing. The police and DSS were contacted by the hospital. In a subsequent interview, the police and DSS learned that Weaver and Brandon only had ten dollars in cash, had no electricity in their home, and they had little food. Weaver and Brandon were then arrested and charged with felony child endangerment. At that time, DSS assumed custody of N.W. and placed her in a foster home.

The charges against Weaver and Brandon were later determined to be unfounded and dropped; N.W., however, remained in the foster home, as DSS felt that the conditions of the home environment were unsafe.

On November 14, 2004, DSS prepared the initial Foster Care Service Plan (the "initial plan"). The initial plan had the concurrent goals of either returning N.W. to her home or placing her with a relative. Under the initial plan, Weaver and Brandon had five responsibilities to complete in order to regain custody of N.W.: (1) cooperate with counseling services to address relationship issues and enhance marital stability; (2) Brandon will seek substance abuse

---

[1] As the parties are fully conversant with the record in this case, and because this memorandum opinion carries no precedential value, this opinion recites only those facts and incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal.

counseling; (3) cooperate with parenting skills instruction; (4) secure employment; and (5) establish and maintain a safe, stable, and suitable home.

Shortly after being released from incarceration, Weaver and Brandon separated, and eventually divorced. Soon after the separation, Weaver began dating, and after his divorce from Brandon was finalized, he eventually married Megan Weaver ("Megan").

On January 18, 2006, DSS filed a petition to terminate Weaver's and Brandon's parental rights to N.W. A hearing on the matter was held on October 10, 2006. At the hearing, the court terminated Brandon's parental rights to N.W., due primarily to Brandon's continued drug use and incarceration on other charges; Weaver, on the other hand, was granted a continuance to allow the Guardian *ad litem* time to observe his interactions with N.W.

On June 8, 2006, the Wythe County Juvenile and Domestic Relations District Court ("J&DR court") denied the petition to terminate Weaver's parental rights to N.W. DSS filed a timely notice of appeal. On April 27, 2007, the trial court heard evidence in this matter and subsequently denied DSS's petition to terminate.

On April 30, 2007, DSS prepared a new Foster Care Service Plan (the "new plan") with concurrent goals of returning N.W. to her home and adoption. Under the new plan, Weaver and Megan had five responsibilities to complete in order to regain custody of N.W.: (1) cooperate with parenting skills instruction; (2) cooperate with a Child/Parent Attachment Evaluation ("attachment evaluation") and follow through with any recommendations made as a result of the evaluation; (3) maintain employment; (4) establish and maintain a safe, stable, and suitable home; and (5) visit N.W. on a regular basis.

In August of 2007, DSS changed its goal concerning N.W. from "return to home" to "adoption." Additionally, DSS filed a petition seeking the termination of Weaver's parental rights to N.W. DSS took these actions based upon Weaver's failure to comply with all his

responsibilities as defined by the plan. According to DSS, Weaver and Megan failed to complete the parenting skills instruction and failed to establish and maintain a safe, stable, and suitable home. Additionally, DSS stated that, due to the length of time N.W. has been in the foster home and the bond that she has developed with her foster family, it would be in N.W.'s best interests to remain with her foster family.

On November 28, 2007, the J&DR court entered an order terminating Weaver's parental rights to N.W. Weaver subsequently appealed.

### Parenting Skills Classes

At the April 7, 2008 termination hearing before the trial court,[2] the court heard testimony from Weaver that, although DSS had offered him multiple opportunities to receive parenting skills instruction, he had repeatedly failed to successfully complete the classes. Initially, Weaver was receiving home-based instruction from Heather Kapranos. However, after only twelve or thirteen sessions, DSS decided to discontinue the home-based instruction, even though Ms. Kapranos admitted that Weaver was showing some signs of improvement.

DSS then offered parenting classes with Lynn Bowman. According to Ms. Bowman, Weaver and Megan missed the first three classes due to a scheduling mix-up. Weaver and Megan then attended the next two classes, but never returned for the remaining eight classes.[3] Weaver and Megan were given another chance to take the parenting skills classes with Ms. Bowman in May-June of 2007. This time, Weaver and Megan missed two classes (four

---

[2] The trial court incorporated the evidence from the April 27, 2007 hearing into the present hearing. For the purposes of clarity, the evidence presented at both hearings is discussed together here.

[3] The first round of parenting skills classes with Ms. Bowman consisted of thirteen, one-hour long classes.

hours of class time).  Weaver and Megan partially made up for at least half of the missed class time by staying late on the subsequent classes.[4]

## Safe, Stable, and Suitable Home

The court also heard testimony from Weaver that he had moved at least twelve times in the last three and a half years.  In November of 2004, after being released on the felony child endangerment charges, Weaver lived with his mother in Speedwell, Virginia.  He then lived in the basement of Megan's parents' home for a few weeks.  He and Megan next moved to a studio apartment in Wytheville, Virginia.  Weaver and Megan then moved to another apartment in Wytheville, because the studio apartment didn't have any room for N.W.  After DSS determined that the steps of the Wytheville apartment were unsafe, Weaver and Megan then moved to a house in Speedwell.  After Ms. Kapranos expressed some concern over the presence of a wood stove in the Speedwell house, Weaver and Megan moved back into Megan's parents' basement.  From there they moved into a trailer in Wytheville.  After being evicted from the trailer for failing to pay rent, Weaver and Megan shared a friend's apartment.  They then moved into a double-wide trailer in Wythe County.  After DSS expressed some concerns over the fact that the trailer was currently for sale, Weaver and Megan moved into an apartment in Independence, Virginia.  A short time later, Weaver discovered black mold in the apartment, so he and Megan moved into another apartment in Independence.

## Attachment Evaluation

Additionally, testimony was heard from Dr. Whelan regarding the attachment evaluation.  The attachment evaluation examined the quality of the relationships between N.W. and Weaver,

---

[4] The second round of parenting skills classes consisted of six, two-hour long classes, with the exception of the first class, which was three hours.  Weaver and Megan attended classes on May 25 and June 8, 15, and 29.  They missed class on June 1 and 22, but stayed an extra hour on June 8 and 29 to make up for some of the missed time.

Megan, and N.W.'s foster parents, Mr. and Mrs. Lewis. Dr. Whelan explained that, based on N.W.'s interactions with Weaver and Megan, she had a moderate to high risk for serious problems in the future. Dr. Whelan felt that Weaver and Megan did not, at that time, have the ability to properly address N.W.'s emotional needs. He also testified that it was unlikely that intervention would lead to significant changes in Weaver's ability to address these needs. He further opined that if Weaver and Megan were motivated to participate in psychotherapy and responded well to the treatment, it would likely take one to three years before they would become sensitive to N.W.'s emotional needs.

In contrast, N.W.'s interactions with her foster parents were a mix of avoidant and secure patterns, which is within the average range of interaction for a child N.W.'s age. Further, Dr. Whelan felt that Mr. and Mrs. Lewis were a source of significant emotional healing for N.W., although there was some room for improvement.

### Court's Decision to Terminate

After hearing all of the evidence, the trial court found that, although Weaver had changed jobs a number of times since N.W. was removed from the home, Weaver had maintained stable employment. Additionally, the court commended Weaver on his efforts to remain employed. However, the trial court also found that Weaver had not demonstrated that he could provide the kind of stability that N.W. needed in her life.

The trial court ultimately decided that this lack of stability combined with Weaver's continued failure to successfully complete the parenting skills classes demonstrated by clear and convincing evidence that Weaver had failed to make substantial progress towards elimination of the conditions which required N.W.'s foster care placement. The trial court found that termination was in N.W.'s best interest and, as such, terminated Weaver's parental rights to N.W.

ANALYSIS

> [B]efore residual parental rights can be terminated under Code
> § 16.1-283(C)(2), a court must find:  (1) by clear and convincing
> evidence; (2) that termination is in the child's best interests; and,
> (3) that the parent or parents, without good cause, have been
> unwilling or unable within a reasonable period of time not to
> exceed twelve months from the date the child was placed in foster
> care to remedy substantially the conditions which led to the child's
> foster care placement, notwithstanding the reasonable and
> appropriate efforts of social, medical, mental health or other
> rehabilitative agencies to such end.

C. S. v. Va. Beach Dep't of Soc. Servs., 41 Va. App. 557, 565, 586 S.E.2d 884, 888 (2003).

In the present case, Weaver contends that the trial court erred in finding sufficient evidence (1) that DSS made reasonable and appropriate efforts to reunite Weaver with N.W. and (2) that Weaver had not made substantial progress in remedying the conditions which required N.W.'s continued placement in foster care.

Preservation

As an initial matter, DSS argues that Weaver failed to preserve his sufficiency argument and, as such, this Court is precluded from considering the matter as a basis for reversal. See Rule 5A:18.  Specifically, DSS argues that, although Weaver made an initial motion to strike after DSS had finished presenting its evidence, he failed to renew that motion after presenting his evidence.

"If a closing argument adequately advises the trial court of the defendant's position and if it is clear that the trial court considered the issue and had an opportunity to take corrective action, the contemporaneous objection rule is satisfied." Fortune v. Commonwealth, 14 Va. App. 225, 228, 416 S.E.2d 25, 27 (1992) (citing Campbell v. Commonwealth, 12 Va. App. 476, 478, 405 S.E.2d 1, 2 (1991) (*en banc*)).  Here, Weaver argued in his motion to strike that the evidence was insufficient to show (1) that DSS's actions were "reasonable and appropriate efforts to reunite his family" and (2) that he was not making substantial progress in remedying the situation.  In his

closing argument, Weaver argued that the evidence showed (1) that DSS's actions were not reasonable and appropriate efforts to reunite Weaver with N.W. and (2) that he was making substantial progress in remedying the situation.

Although the motion to strike was worded in the negative and the closing argument was worded in the positive, both amount to the same argument: the evidence was insufficient to show (1) that DSS's actions were reasonable and appropriate efforts to reunite his family and (2) that he was not making substantial progress in remedying the situation. As such, we find that Weaver's argument was properly preserved for appeal.

Reasonable and Appropriate Efforts

Upon review of a trial court's decision to terminate parental rights, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990). "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (citation omitted).

Weaver's primary argument is that the evidence shows that DSS acted in an extremely adverse manner and, therefore, the evidence is insufficient to prove that DSS acted with reasonable and appropriate efforts to reunite N.W. with her father. Weaver argues that this adversity can be shown based on (1) DSS's decision to stop providing home-based instruction with Ms. Kapranos in January of 2006, even though Weaver was making progress; (2) DSS's decision to reduce the length of his visitations with N.W. and require that the visitations occur at the DSS office; and (3) DSS's decision to petition the court for termination of Weaver's parental rights before the attachment evaluation had been completed.

After DSS terminated the home-based sessions with Ms. Kapranos, Weaver was offered two chances to complete the parenting skills instruction with Ms. Bowman, but he failed to do so. The failure to successfully complete the parenting skills classes with Ms. Bowman must fall squarely upon Weaver's shoulders. DSS made reasonable and appropriate efforts to ensure that the classes were available to Weaver; therefore, DSS cannot be faulted for Weaver's failure to take advantage of the opportunities presented to him.

Similarly, the record demonstrates that the decision to reduce the length of his visitations with N.W. was due to comments made by Weaver's mother to N.W., and not because of any adversity on the part of DSS. Fran Anders, N.W.'s case worker, testified that the length and location of the visits were necessarily limited, due to the requirement that the visitation must be supervised anytime Weaver's mother would be present. Ms. Anders also testified that she had informed Weaver that if he informed her ahead of time that his mother was not going to be present during the visit, arrangements could be made so that the visits would not have to be monitored. According to Ms. Anders, these unmonitored visits could be longer, as no overtime would be required from DSS employees. However, because Weaver was unwilling to preclude his mother from attending the visitations, DSS was forced to shorten the duration of the visitations and monitor them.

Finally, Ms. Anders also testified regarding the reason that DSS filed the new permanency plan at the time it did. According to Ms. Anders's uncontradicted testimony, the decision to file the new permanency plan was primarily due to the fact that DSS would lose the federal funding it was receiving for N.W.'s placement if the new plan had not been filed at that time. Thus, as with the shortened visitation, the decision was based on independent policy requirements.

Based on these facts, the record clearly shows that DSS offered two additional parenting skills classes to Weaver after canceling the home-based program. Furthermore, the decisions to reduce his visitation sessions and to file for termination of his parental rights were based on policy, not on any animosity toward Weaver. As such, the record demonstrates that there is sufficient evidence showing that DSS acted with reasonable and appropriate efforts to reunite N.W. with her father.

### Substantial Progress in Remedying the Situation

Weaver had five requirements he had to meet before he could regain custody of his daughter. Of those five requirements, the record demonstrates that Weaver failed to complete two of them and had little likelihood of meeting a third.

Under the new plan, Weaver was required to establish and maintain a safe, stable, and suitable home. The trial court specifically admonished Weaver regarding this fact, stating at the April 27, 2007 hearing: "There has to be stability for the child. You cannot move every other month." The evidence shows that, beginning in November of 2004 until April of 2008, a period of forty-two (42) months, Weaver moved at least twelve (12) times. This averages to one move every three and a half months. Additionally, of these twelve locations, the evidence shows that DSS found only one of those locations acceptable by their standards.

Additionally, Weaver was required to successfully complete the parenting skills classes. The initial, home-based sessions were terminated by DSS, and as such, it cannot be said that Weaver failed to complete this program. However, as we noted above, he must bear sole responsibility for his failure to complete either of the two parenting skills programs with Ms. Bowman.

Finally, Weaver was required to submit to an attachment evaluation and follow through with any recommendations made as a result. Although Weaver did submit to the attachment

evaluation, the results indicated that Weaver lacked the skills/ability to meet N.W.'s attachment patterns and emotional needs. According to the results of the attachment evaluation, if the court returned N.W. to Weaver and Megan, significant intervention would be needed, requiring Weaver to undergo at least one to three years of intense psychotherapy.

Based on Weaver's prior history of failing to complete the parenting skills classes, it is reasonable to question his ability to meet this goal. Moreover, the one to three year time frame moves N.W. away from the finality and permanency cited by the trial judge in his ruling. Even if Weaver was willing, the attachment evaluation calls into question whether he would be able to develop the skills necessary to deal with the child's attachment patterns and emotional needs.

## CONCLUSION

Given the evidence in this case, the trial court had sufficient factual grounds to support its decision that Weaver had not, within a reasonable period of time, substantially remedied the conditions that required N.W.'s continued placement in foster care and that termination was in her best interests. See Code § 16.1-283(C)(2). Therefore, we affirm the trial court's decision to terminate Weaver's residual parental rights under Code § 16.1-283(C).

Affirmed.