UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Felton, Judges Kelsey and Petty
Argued at Richmond, Virginia

CANDICE SULLIVAN

MEMORANDUM OPINION* BY
v.        Record No. 0809-13-2          JUDGE WILLIAM G. PETTY
APRIL 1, 2014

FREDERICKSBURG DEPARTMENT
 OF SOCIAL SERVICES

FROM THE CIRCUIT COURT OF THE CITY OF FREDERICKSBURG
William H. Ledbetter, Jr., Judge Designate

Teresa L. Pagliaro (The Pagliaro Law Firm, on briefs), for appellant.

(Stuart C. Sullivan, III; Stuart C. Sullivan & Carolyn S. Seklii,
Attorneys at Law, P.L.C., on brief), for appellee.  Appellee
submitting on brief.

Robin N. Krueger (Strentz & Greene, LLC), Guardian *ad litem* for
the infant children.[1]

Candice Sullivan appeals from an order of the circuit court terminating her parental rights

to W. and C.[2]  On appeal, Sullivan argues that the circuit court erred in terminating her parental

rights because (1) the Fredericksburg Department of Social Services (DSS) failed to demonstrate

by clear and convincing evidence that Sullivan, without good cause, had been unwilling or

unable to remedy substantially the conditions that led to, or required the continuation of, the

children's placement in foster care, and (2) DSS failed to prove by clear and convincing evidence

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] On appeal, DSS waived oral argument.  However, the children's guardian *ad litem*
appeared and argued on behalf of the children, espousing DSS's on-brief arguments.

[2] We will refer to the children by their first initial.

that termination of Sullivan's parental rights was in the children's best interests. For the reasons stated below, we affirm the ruling of the circuit court.

I.

Because the parties are fully conversant with the record in this case and this memorandum opinion carries no precedential value, we recite below only those facts and incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal. On appeal, we view the evidence in the light most favorable to the party prevailing below and grant to it all reasonable inferences fairly deducible therefrom. Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

II.

Sullivan argues that the circuit court erred in terminating her parental rights. Specifically, Sullivan argues that the circuit court erred because she was willing and able to remedy substantially the conditions which led to the children being placed and remaining in foster care. Sullivan also argues that the termination of her parental rights was not in the children's best interests. We disagree.

The standard of review for a case involving the termination of parental rights is well settled: "We presume the circuit court thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 266, 616 S.E.2d 765, 769 (2005). Moreover, "[w]here, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittslyvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986) (citations omitted).

## A. Background

In April 2011, Sullivan lived with her two children, W. and C. and her boyfriend, Patrick Dawson. W. was three years old, and C. was one year old. On April 16, 2011, Sullivan brought W. to the hospital with a spiral fracture in his femur. Sullivan stated that W. broke his leg by falling off a couch. It was later determined that Dawson fractured W.'s femur. Dawson was convicted of felony child neglect, and Sullivan was convicted of contributing to the abuse or neglect of her child.

DSS subsequently removed W. and C. from Sullivan's care. The Fredericksburg JDR court found that W. was abused and neglected and C. was at risk of being abused. Therefore, the children were placed in foster care.

While in foster care, W. displayed inappropriate sexual behavior. In June 2011, W. underwent an interdisciplinary prescriptive health and developmental evaluation. W. was diagnosed as a victim of physical abuse and sexual abuse. The report concluded that "[r]eturn to family of origin should proceed carefully and cautiously." W. showed progress in therapy, which his therapist attributed to "the stable relationship and attachment that [W. had] with his foster parent."

Sullivan was allowed visitation with her children; however, she was ordered not to have any contact with Dawson. Sullivan arrived for her visitations and had clean drug screenings. But, in May 2011, DSS suspended Sullivan's visitations because it learned that Sullivan had been in contact with Dawson. Sullivan's visits were allowed to resume in July 2011 but were suspended shortly thereafter because W. had "uncontrollable and dangerous behavior" after their visits.

Moreover, DSS offered numerous services to Sullivan after the children entered foster care. Sullivan completed parenting classes and participated in all of the permanency planning

meetings.  Sullivan also participated in a psychological assessment, which concluded that she had borderline intellectual functioning and her ability to process and retain information was "poor."  Sullivan's coping skills were also found to be limited, which placed her at a "significant disadvantage when facing a difficult situation or problem."

DSS referred Sullivan to mental health support services and individual counseling.  In February 2012, Sullivan reported to DSS that she started outpatient therapy, but she did not seek mental health support services.

Because of Dawson's incarceration, Sullivan was not able to afford the apartment where she lived with her children and Dawson.  Sullivan lived with friends and stayed in motels, while working at a fast-food restaurant.  Sullivan was finally able to obtain housing in March 2012, eleven months after the children entered foster care.  A home study was conducted by DSS in April 2012.  The social worker who conducted the study concluded that Sullivan was living within her financial means, but it would be a "struggle for [Sullivan] to adequately care for the children on her income."  Without additional financial support, the social worker did not support the return of the children to Sullivan's care.  Furthermore, there was evidence that Sullivan had difficulty with basic independent living skills, such as filling out applications, budgeting, and finding resources.

On May 14, 2012, a therapeutic visitation assessment was completed.  During the interview, Sullivan continued to state that W. broke his leg by falling off a couch.  Sullivan "exhibited a limited understanding of the causal relationship between her actions and/or inactions to date and the resulting implications for reunification."  The therapist concluded that "visitation [should] proceed cautiously and in alignment with a plan that is flexible and responsive to the differing needs of each child."  The therapist testified that "a best case scenario" would be that

the entire process of reunification would take four to six months. Even then, the therapist "had a very guarded prognosis about the success of this case."

After receiving the home study and therapeutic visitation assessment, DSS decided to seek termination of Sullivan's parental rights. The termination of parental rights petitions were filed on May 21, 2012. On October 4, 2012, the JDR court terminated Sullivan's parental rights. Sullivan appealed to the circuit court. The circuit court concluded it was in the children's best interests to terminate Sullivan's parental rights. This appeal followed.

### B. Termination of Parental Rights Pursuant to Code § 16.1-283(C)(2)

Sullivan's parental rights were terminated pursuant to Code § 16.1-283(C)(2), which states that a court may terminate parental rights if there is clear and convincing evidence that termination is in the best interests of the children and

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Decisions to terminate parental rights under Code § 16.1-283(C)

> hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes. Considerably more "retrospective in nature," subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he [or she] has been offered rehabilitation services.

Toms, 46 Va. App. at 271, 616 S.E.2d at 772 (citation omitted). "'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the

court." Ferguson v. Stafford Cnty. Dep't of Soc. Servs., 14 Va. App. 333, 338, 417 S.E.2d 1, 4 (1992).

Sullivan argues that the circuit court erred in terminating her parental rights because she was willing and able to remedy substantially the conditions which led to the children being placed and remaining in foster care. Sullivan asserts that she acquiesced to every reasonable request from DSS and that DSS did not offer her some services until the children had been in foster care for almost one year. Notably, Sullivan points out that the home study was not completed until April 2012, and the therapeutic visitation assessment was not completed until May 2012. Thus, Sullivan contends that DSS caused the delays in providing her with necessary services, which caused her non-compliance with the statutory twelve-month limitation.

Sullivan relies on C.S. v. Virginia Beach Department of Social Services, 41 Va. App. 557, 586 S.E.2d 884 (2003), to support her argument. In C.S., the Court found that DSS did not offer family therapy and could not require that the mother comply with a service that was not provided. Id. at 569, 586 S.E.2d at 890. Accordingly, the Court held that the mother substantially remedied, within twelve months, the conditions which led to her children being placed in foster care. Id. at 570, 586 S.E.2d at 890.

Here, unlike in C.S., DSS did not delay its services or deny certain services to Sullivan. DSS could not consider returning the children to Sullivan's care until it could see how Sullivan was progressing with her housing situation. The children entered foster care in April 2011. Sullivan did not obtain housing until March 2012. After Sullivan obtained housing, DSS ordered the home study and therapeutic visitation assessment. At that time, the children had been in foster care for approximately one year. Nevertheless, DSS was willing to extend the time frame at the permanency planning hearing in order to see if the children could be reunited with Sullivan. After receiving the home study and the therapeutic visitation assessment, it became

apparent to DSS that Sullivan would be unable to remedy her circumstances in a reasonable period of time. The prognosis, which was "guarded," showed that it would take at least four to six more months to reunite the family, at which point the children would have been in foster care for approximately a year and a half.

"The twelve-month time limit established by Code § 16.1-283(C)(2) was designed to prevent an indeterminate state of foster care 'drift' and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement." L.G. v. Amherst Cnty. Dep't of Soc. Servs., 41 Va. App. 51, 56, 581 S.E.2d 886, 889 (2003). "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

At trial, DSS acknowledged that Sullivan had completed many of its requirements; however, "it is[ not] a situation where you need to jump through the hoops and then you get your children back or cross things off a list and then you get your children back." Sullivan still had limitations in her ability to parent and care for her children. Sullivan had not been able to remedy her situation within the requisite time period. Therefore, based upon a review of the circumstances in this case, DSS provided reasonable and appropriate services to Sullivan and there was clear and convincing evidence that Sullivan was unwilling or unable to remedy the problems during the period in which she was offered services. Accordingly, there was sufficient evidence supporting the circuit court's decision to terminate Sullivan's parental rights under Code § 16.1-283(C)(2).

## C. Best Interests of the Children

Sullivan next argues that termination of her parental rights was not in the best interests of the children. We disagree.

When considering termination of parental rights, "the paramount consideration of a trial court is the child's best interests." Logan, 13 Va. App. at 128, 409 S.E.2d at 463. Moreover, as mentioned above, "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." Kaywood, 10 Va. App. at 540, 394 S.E.2d at 495.

In determining what is in the best interests of a child, this Court has stated that

> a court must evaluate and consider many factors, including the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

Barkey v. Commonwealth, 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986).

Sullivan contends that she complied with all of DSS's requests. Sullivan insists that DSS erred in suspending her visitations in July 2011. DSS explains that the visitations were suspended because W. began acting out after his visitations with Sullivan. For example, at preschool, W. cursed at the teachers, threatened the teachers and students, and was violent. Sullivan notes that the problem was with the preschool, not her visitations. Admittedly, W.'s behavior improved after changing preschools; however, as the trial court noted, Sullivan never sought visitation after it was suspended in July 2011.

Sullivan participated in a therapeutic visitation assessment in late April 2012. At the time of the assessment, Sullivan showed "no empathy . . . for her son or his experiences." Sullivan still insisted that W. fell off a couch and fractured his leg, despite medical evidence to the contrary. Sullivan refused to acknowledge negative behavior that W. had after visiting her in July. Sullivan merely said that W. was not listening well. Throughout the entire interview, Sullivan "maintained a flat effect."

Meanwhile, the evidence proved that the children were doing well in foster care.  W. went to a counselor who helped him deal with his temper and boundary issues.  W.'s behavior significantly improved over time.

The circuit court concluded it was in the children's best interests to terminate Sullivan's parental rights.  The record supports the court's determination.

III.

For the foregoing reasons, we affirm the circuit court's decision.

Affirmed.