COURT OF APPEALS OF VIRGINIA

Present: Judges Petty, AtLee and Senior Judge Clements

PAULA DAYWALT

MEMORANDUM OPINION*
v.      Record No. 0399-18-3                     PER CURIAM
                                                 JULY 10, 2018

HARRISONBURG ROCKINGHAM
 SOCIAL SERVICES DISTRICT

FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
Thomas J. Wilson, IV, Judge

(Avery B. Cousins, III; Cousins Law Offices, on brief), for
appellant.

(Rachel Erret Figura, Assistant County Attorney; W. Andrew
Harding, Guardian *ad litem* for the minor child; Convy & Harding,
PLC, on brief), for appellee.

Paula Daywalt (mother) appeals the orders terminating her parental rights to her child and

approving the foster care goal of adoption. Mother argues that the circuit court erred by terminating

her parental rights and approving the goal of adoption because (1) the Harrisonburg Rockingham

Social Services District (the Department) did not "meet the requirements" of Code § 16.1-283(C);

and (2) the Department "did not fully explore" relative placements as required by Code

§ 16.1-283(A). Upon reviewing the record and briefs of the parties, we conclude that this appeal

is without merit. Accordingly, we summarily affirm the decision of the circuit court. See

Rule 5A:27.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

UNPUBLISHED

BACKGROUND

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" Farrell v. Warren Cty. Dep't of Soc. Servs., 59 Va. App. 375, 386, 719 S.E.2d 329, 334 (2012) (quoting Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1180, 409 S.E.2d 16, 18 (1991)).

Mother and Eric Lam (father) are the biological parents of the child who is the subject of this appeal. After mother gave birth to the child, mother and father told the hospital staff that they did not intend to take the baby home and wanted to place him for adoption. The hospital staff contacted the Department, and a social worker met with mother and father at the hospital after the child's birth in December 2016. Father told the social worker that they were unemployed and homeless and could not take care of the child. The hospital staff and social worker noticed that mother allowed father to speak for her and would not speak with anyone unless he was present. The social worker discussed with mother and father their options, including relative placement, an entrustment agreement, and foster care. The social worker was "not comfortable" with mother and father signing an entrustment agreement at the hospital because they "presented as cognitively limited." When the social worker inquired about possible relatives who could care for the child, father could not provide contact information for one of his relatives, and he said that they did not want mother's relatives to be considered as a possible placement. Mother left the hospital against medical advice in order to keep an appointment regarding social security in Winchester.

Since there were no readily available options for relative placement, the Department placed the child in foster care. On January 11, 2017, the Harrisonburg Rockingham Juvenile and

Domestic Relations District Court (the JDR court) adjudicated that the child was abused or neglected. Mother did not appear at the hearing.[1]

Mother returned to Pennsylvania, where she was raised. Her parents, Luther and Patricia Daywalt, lived in Pennsylvania. Luther and Patricia Daywalt stated that they wanted to be considered a relative placement for the child. In January 2017, the Department sent a request to Pennsylvania through the Interstate Compact on Placement of Children (ICPC), but it was denied because of prior child protective services (CPS) concerns. Luther and Patricia Daywalt did not raise any of their biological children. Mother and her two brothers were removed from their care, and mother had lived with her great-great uncle since she was young.

Mother's great-great uncle and aunt, Lee and Mary Ditch, also lived in Pennsylvania. Lee and Mary Ditch expressed an interest in having the child being placed with them, so in January 2017, the Department sent a request to Pennsylvania through the ICPC. On February 16, 2017, Lee and Mary Ditch attended an orientation session, where they received paperwork to complete by March 16, 2017. On March 24, 2017, Mary Ditch contacted the Franklin County Children and Youth Services in Pennsylvania and requested an extension, which was granted through April 10, 2017. Then, Mary Ditch informed the local department that she was "struggling to complete a lot of the paperwork due to lack of cooperation from the rest of the household." On May 17, 2017, the ICPC was denied because of non-compliance with the home study process and failure to complete the required paperwork. In addition, the Department expressed concern about placing the child with Lee and Mary Ditch because of their age and

---

[1] The Department presented evidence at the circuit court hearing that mother did not appear at the preliminary removal hearing in December 2016, the adjudicatory hearing in January 2017, the initial foster care review and dispositional hearing in February 2017, and the foster care review hearing in May 2017. The first hearing that mother attended was the termination of parental rights hearing in the JDR court.

- 3 -

medical problems. Lee Ditch was seventy-eight years old and had significant hearing loss. Mary Ditch was diagnosed with cancer.

On January 18, 2017, mother told the Department that she did not want to have any contact with the Department or visit the child. Considering that mother and father initially expressed no interest in caring for the child, the Department pursued a goal of relative placement and a concurrent goal of adoption. However, mother later changed her mind about her involvement with the child, and the Department sent her a letter explaining what services she needed to complete. The Department required mother to engage in individual counseling, group counseling, medication management, monthly meetings with the Department, random drug screens, supervised visitation with the child, and a psychological evaluation with Dr. Joann Grayson. The Department also required that mother pay child support and follow all court orders.

The Department offered mother supervised visitation, and although she did not have a regular schedule for visitations, she did not miss any of the scheduled visitations. Mother usually visited once a month; however, in September 2017, she asked to visit more frequently because her lawyer told her to request additional visits. Mother's family came with her to the visits, and it was not until September 18, 2017 that mother visited with the child by herself for thirty minutes.[2] The Department noticed that during the visitations, mother did not know what to do if the child was fussy because she knew only three things to do to calm the child, namely change him, feed him, or place him on the blanket on the floor. Her family had to help her with the child. The Department also observed that mother was "not too aware of her surroundings and what [the child] could be taking in" because she would use curse words or inappropriate language around the child.

---

[2] The Department supervised all of the visits.

After one of the supervised visits in July 2017, the Department reviewed mother's progress with her and discussed the services that she had to complete. Mother stated that she and Patricia Daywalt completed a parenting class in Pennsylvania, and she provided a copy of the certificate to the Department a week before the termination of parental rights hearing in the JDR court.

In January 2017, the Department recommended that mother complete a psychological and parenting evaluation with Dr. Grayson. In August and September 2017, mother finally met with Dr. Grayson. After interviewing, observing, and testing mother, Dr. Grayson concluded that mother had "a combination of intellectual impairment and serious psychiatric difficulties." Dr. Grayson found that mother was "dependent upon others for direction" and "unable to operate independently." Dr. Grayson also determined that mother had "unrealistic ideas about the time and attention children need," and consequently, was a "high risk for serious neglect." Dr. Grayson was concerned that mother had "an inflated opinion of her abilities as a parent" and would be "unlikely to accept direction because she feels as though she knows everything she needs to know in order to parent." Dr. Grayson described mother as "self-absorbed" and stated that she "lack[ed] empathy of children and other people." Dr. Grayson explained, "Given her high endorsement of corporal punishment, her low frustration level, her propensity to having anger outbursts, and her inability to empathize with children, [mother] is at risk for physical abuse." Dr. Grayson expressed concern that there would be "safety issues if [mother] would be left alone to care for a child, even for a short time." Lee Ditch agreed with this assessment and told Dr. Grayson that mother "would never be left alone with her child ('not for a minute'!)." Dr. Grayson recommended that mother be supervised while she is with children, and that if the child was placed with Lee Ditch or Patricia Daywalt, "the maximal amount of in-home services should be supplied."

On October 4, 2017, the JDR court entered the permanency planning order and approved the goal of adoption. On the same date, the JDR court terminated mother's parental rights to the child. Mother appealed to the circuit court.

On December 12, 2017, the parties appeared before the circuit court. The Department presented evidence that mother did not have independent housing and had never lived independently. The social worker testified that she had not "seen anything about [mother] and the way she operate[d] that indicate[d] that [mother was] independent in any sort of way."

The social worker also testified that Lee Ditch admitted that mother "can't do parenting, can't do parenting by herself with [the child], but that they would all be around to help out." Mary Ditch testified that mother could be a "good mom" with help.

The Department investigated both paternal and maternal relatives as possible relative placements. After investigating several paternal relatives, the Department found "no viable placement on the paternal side." The Department expressed concerns about Lee and Mary Ditch as possible relative placements because of their age and health conditions. Mary Ditch testified that her husband had a "mild heart attack" over the summer.

Another concern was Lee Ditch's criminal history. Lee Ditch admitted that "a little over a year" ago, he pleaded guilty to a charge, but he was not sure what it was. The original charge was that he "touched" a minor girl, but "they reduced [his] charge." When asked by the circuit court, he said that he could not remember what his conviction was.

The Department also expressed concerns about Luther and Patricia Daywalt as possible relative placements because of their CPS history and substance abuse.[3] At trial, Luther Daywalt admitted to using marijuana and being convicted of "stealing a dump truck trailer and Bobcat."

---

[3] On May 17, 2017, Luther Daywalt refused to take a drug test, and on October 3, 2017, he tested positive for marijuana. Patricia Daywalt tested positive for marijuana on May 17 and October 3, 2017.

He served three years in prison. He also stated that he and Patricia Daywalt were living in a trailer because he "lost everything" in a house fire in February 2017.

The guardian *ad litem* submitted photographs of the front and rear yards of the homes where the Ditches and Daywalts lived. Luther Daywalt identified several vehicles in the yard, as well as a car lift, container, large brush pile, and the "remainder of what was [his] home" after it burned.

Mother testified that she was living with Lee and Mary Ditch. She admitted that she completed the psychiatric evaluation, the parenting classes, and went to the Community Services Board in Pennsylvania. Mother explained that her parenting classes consisted of two meetings at the Chambersburg YMCA. She testified that she knew "what's needed to take care of a kid."

The Department presented evidence that the child was doing well in foster care and was placed in a potential adoptive home. The child was receiving physical therapy to help with his gross motor development. The social worker testified that the child was progressing.

After hearing all of the evidence and argument, the circuit court terminated mother's parental rights pursuant to Code § 16.1-283(C)(2) and approved the goal of adoption. The circuit court held that none of the maternal relatives would be appropriate relative placements. On December 12, 2017, the circuit court entered an order terminating mother's parental rights pursuant to Code § 16.1-283(C)(2), and on December 19, 2017, it entered the permanency planning order and approved the goal of adoption. This appeal followed.

ANALYSIS

Mother argues that the circuit court erred by terminating her parental rights and approving the goal of adoption.[4] "Where, as here, the court hears the evidence *ore tenus*, its

---

[4] With respect to mother's challenge of the foster care goal of adoption, "[o]ur decision to affirm the termination order necessarily subsumes this aspect of [her] appeal because a preponderance-of-the-evidence standard governs judicial modifications of foster care plans."

finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190, 717 S.E.2d 811, 814 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986)). "When considering termination of parental rights, 'the paramount consideration of a trial court is the child's best interests.'" Id. (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460 463 (1991)).

*Code § 16.1-283(C)(2)*

Mother argues that the circuit court erred in terminating her parental rights and approving the goal of adoption because the Department failed to comply with the statutory requirements in Code § 16.1-283(C). Mother asserts that she met all of the Department's requirements because she completed the psychiatric and parenting evaluation, attended parenting classes, contacted the Community Services Board in Pennsylvania, and visited with the child. She further contends that the Department did not provide her with reasonable and appropriate services, especially considering her cognitive limitations and her "abusive and controlling" relationship with father.

The circuit court terminated mother's parental rights pursuant to Code § 16.1-283(C)(2), which states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2).

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 265 n.3, 616 S.E.2d 765, 769 n.3 (2005).

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005). "Considerably more 'retrospective in nature,' subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services." Id. (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

The evidence proved that mother was unwilling or unable to remedy the problems that led to the child being placed, and remaining, in foster care. In December 2016 and January 2017, mother abandoned the child and told the Department that she did not want to care for the child. Mother contends that she acted this way because father was abusive and controlling her, but even after her family became more involved, she was slow to comply with the Department's requirements. She did not come to any of the hearings until the JDR court terminated her parental rights in October 2017. She only visited the child once a month until her lawyer told her in September 2017 to request additional visits. When she visited the child, she required help from her family if the child did not respond after she changed him, fed him, and placed him on the floor. She did not have her first meeting with Dr. Grayson until August 2017.

The circuit court found that Dr. Grayson's report was "quite telling as to what the mother's limitations are [and] her needs for assistance in almost everything dealing with parenting." The circuit court held that "mother is pretty much reliant on other people for everything, everything." It concluded that mother is "in effect the same person now who abandoned the child[,] with the same limitations and problems that existed prior to the abandonment[,] other than she no longer lives with [father]."

Contrary to mother's arguments, the Department proved with clear and convincing evidence that mother failed to remedy substantially the conditions that led to the child being placed in foster care and that termination of parental rights was in the child's best interests. "We have defined clear and convincing evidence as 'that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" C. S. v. Va. Beach Dep't of Soc. Servs., 41 Va. App. 557, 565-566, 586 S.E.2d 884, 888 (2003) (quoting Gifford v. Dennis, 230 Va. 193, 198 n.1, 335 S.E.2d 371, 373 n.1 (1985)). "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." Id. at 566, 586 S.E.2d at 888 (quoting Gifford, 230 Va. at 198 n.1, 335 S.E.2d at 373 n.1).

Mother also argues that the Department did not offer her reasonable and appropriate services. "'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." Ferguson v. Stafford Cty. Dep't of Soc. Servs., 14 Va. App. 333, 338, 417 S.E.2d 1, 4 (1992). In the foster care plan dated January 30, 2017, the Department required mother to participate in supervised visitation, parenting classes, individual and group counseling, monthly meetings with the social worker, and a monthly parenting group. The Department also recommended that mother complete the psychological examination with Dr. Grayson, but mother did not meet with Dr. Grayson until August and September 2017. Dr. Grayson's first recommendation was that mother should have supervised contact with children. Dr. Grayson found that mother's cognitive disabilities affected her ability to parent and live independently. The testing showed that mother was at a "very high risk of neglect, for physical abuse, for emotional abuse, and for lack of proper supervision of children."

Since mother did not complete the psychological evaluation earlier in the process, the Department was unable to provide additional services, beyond counseling and supervised visitation, to mother prior to the termination of parental rights hearing. We find that the Department offered reasonable and appropriate services given the circumstances of this case.

At the time of the circuit court hearing, the Department proved that mother was unwilling or unable to remedy the situation that led to the child being placed, and remaining, in foster care. The circuit court found that mother "made some visits" with the child, "attended two classes at a YMCA . . . for a parenting class," and "finally completed the psychological and parenting evaluation." However, after considering all of the evidence and mother's needs, the circuit court held that it was in the child's best interests to terminate mother's parental rights. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 322, 746 S.E.2d 509, 522 (2013) (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990)).

Accordingly, the circuit court did not err in terminating mother's parental rights pursuant to Code § 16.1-283(C)(2).

*Code § 16.1-283(A)*

Mother argues that the circuit court erred in terminating her parental rights and approving the goal of adoption because the Department "did not fully explore the placing of the child with [mother's] family as required by Code [§] 16.1-283(A)." Mother contends that her family was supportive of her and the child and immediately expressed an interest in being considered as a relative placement.

Before terminating a parent's rights, "the court shall give a consideration to granting custody to relatives of the child, including grandparents." Code § 16.1-283(A). "This Court has held that this provision obligates [the Department] 'to produce sufficient evidence so that the court may properly determine whether there are relatives willing and suitable to take custody of the child, and to consider such relatives in comparison to other placement options.'" Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 567, 811 S.E.2d 835, 845 (2018) (quoting Brown v. Spotsylvania Dep't of Soc. Servs., 43 Va. App. 205, 217, 597 S.E.2d 214, 220 (2004)).

The Department presented testimony from several social workers about their investigations of placing the child with relatives. Furthermore, Luther Daywalt, Lee Ditch, and Mary Ditch testified at the hearing. The evidence proved that the ICPC denied the placements with the Daywalts and the Ditches.

After hearing all of the evidence, the circuit court held that Luther and Patricia Daywalt were not appropriate placements because they previously had children removed from their care. In addition, the circuit court found that "disorganization" and "chaos" described "the general condition of where they're living," and the circuit court was concerned about the positive marijuana tests.

The circuit court also found that Lee and Mary Ditch were not viable relative placements either. The circuit court emphasized their failure to complete the paperwork for the ICPC and stated that the work to complete the paperwork was "nothing compared to the work of trying to take care of a one year old." The circuit court found that they were not in good health. However, the circuit court was especially concerned that Lee Ditch was charged with "some sort of inappropriate touching a child." With respect to his testimony when he said that he did not remember what the offense was, the circuit court stated, "Well, he's either not telling the truth, or

if he genuinely doesn't know what he pleaded guilty to that shows a diminution in capacity that reflects worlds on his inability to serve as an appropriate foster parent if he doesn't know what he pleaded guilty to."

The circuit court held that there was "exceptional – lots of efforts made to find an appropriate relative placement, but it's been without success." Based on the totality of the evidence, the circuit court did not err in finding that the Department investigated possible relative placements, but none were suitable.

CONCLUSION

For the foregoing reasons, the circuit court's ruling is summarily affirmed. Rule 5A:27.

Affirmed.